Ellyn S. Garofalo (SBN 158795)
Amir Kaltgrad (SBN 252399)
CARLTON FIELDS, LLP
2029 Century Park East, Suite 1200
Los Angeles, CA 90067-2913
Telephone:   (310) 843-6300
Facsimile:   (310) 843-6301
Email:       EGarofalo@carltonfields.com
Email:       AKaltgrad@carltonfields.com

Attorneys for Plaintiffs Yao Guo aka Vanessa Guo and Gosdom, Inc.

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| YAO GUO aka VANESSA GUO, an individual; and GOSDOM, INC., a California corporation,<br><br>　　　　　Plaintiffs,<br><br>　　vs.<br><br>KEVIN ROBL, an individual; REMINGTON CHASE aka WILLIAM CHASE aka WILLIAM WESTWOOD, an individual; CHRISTOPHER BREMBLE, an individual; BASE MEDIA TECHNOLOGY GROUP LIMITED, a Hong Kong corporation; PRODUCTION CAPITAL LLC, a Delaware limited liability company; PRODUCTION HOUSE INTERNATIONAL, LLC, a Wyoming limited liability company; JOHN BURGEE, an individual; ROBERT ABRAMOFF, an individual; BURGEE & ABRAMOFF, a California law corporation; and DOES 1-100, inclusive,<br><br>　　　　　Defendants. | Case No.: 2:22-cv-5576<br><br>**COMPLAINT FOR:**<br><br>1. **FRAUDULENT INDUCEMENT;**<br>2. **COMMON LAW FRAUD;**<br>3. **VIOLATION OF CALIFORNIA PENAL CODE § 496c;**<br>4. **BREACH OF FIDUCIARY DUTY;**<br>5. **CIVIL RICO (18 U.S.C. § 1962(c));**<br>6. **CIVIL RICO CONSPIRACY (18 U.S.C. § 1962(d));**<br>7. **SECURITIES FRAUD IN VIOLATION OF CALIFORNIA CORPORATIONS CODE §§ 25401 AND 25501;**<br>8. **SALE OF UNREGISTERED SECURITIES FRAUD IN VIOLATION OF CALIFORNIA CORPORATIONS CODE § 25110;**<br>9. **BREACH OF CONTRACT; AND**<br>10. **BREACH OF CONTRACT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiffs Vanessa Guo and Gosdom, Inc. (collectively, "Plaintiffs") complaint against Defendants Kevin Robl ("Robl"), Remington Chase aka William Chase aka William Westwood ("Chase"), Christopher Bremble ("Bremble"), Base Media Technology Group Limited ("Base Media"); Production Capital LLC ("Production Capital"), Production House International, LLC ("Production House International") (Robl, Chase, Bremble, Base Media, Production Capital and Production House International are referred to collectively as the "Enterprise Defendants"), John Burgee, Robert Abramoff, and Burgee & Abramoff (together with the Enterprise Defendants, "Defendants") and allege as follows:

## NATURE OF THE CASE

1.      This action arises from a massive scheme to defraud Chinese investors both here and abroad into providing debt and equity financing purportedly for the production of a slate of film projects.  The scheme was orchestrated by cabal of Hollywood insiders who seized on an opportunity to line their own pockets with Chinese money.  Plaintiff Vanessa Guo ("Guo") and her extensive contacts in the Chinese community were prime targets of the Ponzi scheme orchestrated by Defendants.

2.      The scheme centered on the offering of short term, high interest loans and equity investments that would purportedly provide "bridge financing" for the production of the films allegedly being produced by the Enterprise Defendants. Having set their sights on Guo, Defendants implemented a variety of devices to deceive Guo into believing that they were successful filmmakers, offering legitimate and lucrative loan and investment opportunities.

3.      Among other things, Defendants arranged for Guo to tour Base Media Technology's ("Base Media") studios in Beijing, Xiamen and Malaysia where she visited the sets of film allegedly being produced by the Enterprise Defendants and provided information that the films would be financed and distributed by major studios including Sony and Disney and predicting that the films would be box

office hits.  Defendants also assured Guo that all investments, whether debt or equity, were effectively secured by completion bonds that would cover any losses caused by delays or budget overruns on the films.

4.      In reliance on Defendants' representations and the façade of success they created, Guo agreed to make several short term loans and equity investments for the production of Defendants' projects.  As the carrot to lure Guo into cultivating additional victims, and as typical of Ponzi schemes, Defendants promptly repaid the principal and interest on Guo's own early loans, solidifying her belief in the profitability and security of the investments.

5.      By the late fall of 2018, Defendants had successfully manipulated Guo into mining her extensive contacts in the Chinese community for additional financing.  Like all Ponzi schemes, early lenders and investors saw impressive returns – at least on paper -- which appeared to be too good to be true.  And they were too good to be true.  Later lenders and investors or those who rolled their initial loans into new loans were less lucky, with the proceeds from their loans not going to production costs but to pay earlier investors or directly into the pockets of the Enterprise Defendants.

6.      The Enterprise Defendants engineered their scheme to position Gosdom as a straw man to insulate the Enterprise Defendants from direct liability.  At Defendants' instruction, Guo would have investors enter into loan agreements with Gosdom.  Gosdom would then enter into parallel loan agreements with Base Media or other entities controlled by Defendants.  Defendants would then direct Gosdom or the Lenders to transfer the loan amounts to entities controlled by Defendants.

7.      Some funds generated by the loans or investments went directly to Base Media, the purported producer, or to other entities designated by the Enterprise Defendants, such as Base FX, a name used by Base Media in connection with the scheme which, in fact, was a fiction.  At the direction of the Enterprise

Defendants, other funds were deposited into the client trust account of the Enterprise Defendants' lawyers, Burgee & Abramoff.  Burgee & Abramoff, however, was merely a conduit for Defendants' fraud, and the funds deposited in its trust account were promptly whisked away by the conspirators.

8.     Under the structure devised by the conspirators, the Enterprise Defendants received the funds from third parties introduced by Guo, but had no direct liability to repay the loans or investments, leaving Gosdom with liability on millions of dollars in what, unbeknownst to Guo and Gosdom, were fraudulent investments that would not be repaid by the Enterprise Defendants.

9.     It was not until the Defendants' payments on the loans and investments dried up that Guo realized something was amiss.  In November 2021, Defendant Chris Bremble, the principal in Base Media the recipient of the majority of the money, confirmed that that the loans and investments were not being used as represented but were being diverted to other purposes.  In April 2022, the scheme was detailed in an article in Variety.  Only then did Guo learn that she had been led down the garden path and the funds had been diverted to the fraudsters and not invested as promised.

10.     Unfortunately, Guo and Gosdom (created at the direction of the fraudsters to insulate them from liability to lenders) have been left holding the bag on substantial losses sustained by Gosdom and its lenders.   Not surprisingly, the massive and far reaching scheme has spawned a myriad of lawsuits, including lawsuits against Guo and Gosdom by lenders seeking to recover the funds misappropriated by Defendants.  In addition, Plaintiffs are informed and believe and based thereon allege, that the SEC filed claims against Chase in connection with his film financing scheme and that Chase has settled the allegations by agreeing to disgorge his ill-gotten gains.

11.     By this lawsuit, Gosdom and Guo seek to recover all damages sustained by Gosdom, including its liability to lenders whose loans remain unpaid.

130325381.1

# **PARTIES**

12.    Plaintiff Gosdom, Inc. ("Gosdom") is, and at all times relevant times was, was a corporation organized and existing in the State of California with its principal place of business in Los Angeles County.

13.    Plaintiff Yao Guo aka Vanessa Guo ("Guo") is, and at all relevant times was, an individual residing in the State of California, County of Los Angeles. At all relevant times, the Chief Executive Officer of Plaintiff Gosdom.  Gosdom and Guo are collectively referred to as "Plaintiffs."

14.    Plaintiffs are informed and believe and based thereon allege that Defendant Kevin  Robl ("Robl") is an individual who is, and at all times relevant was, a resident in Los Angeles County, State of California.  Plaintiffs are informed and believe and based thereon allege that Robl is a principal and manager of Defendants Production Capital, LLC and Base Media Technology Group Limited.

15.    Plaintiffs are informed and believe and based thereon allege that Defendant Remington Chase aka William Chase aka William Westwood ("Chase") is an individual who is, and at all relevant times was, a resident of the State of California, County of Los Angeles.

16.    Plaintiffs are informed and believe and based thereon allege that Defendant Base Media Technology Group Limited ("Base Media"), is a corporation organized and existing under the laws of Hong Kong, with its principal place of business in Beijing, China.

17.    Plaintiffs are informed and believe and based thereon allege that Defendant Production Capital, LLC ("Production Capital") is a limited liability company organized and existing under the laws of the State of Delaware, with its principal place of business in the State of California, County of Los Angeles.

18.    Plaintiffs are informed and believe and based thereon allege that Defendant Production House International LLC is a limited liability company

130325381.1

organized and existing under the laws of Wyoming.  Plaintiffs are further informed and believe that Production House International is controlled by Chase.

19.     Plaintiffs are informed and believe and based thereon allege that Defendant Christopher Bremble ("Bremble") is, and at all times relevant was, an individual residing in the State of California, County of Los Angeles and Beijing, China.   On further information and belief, Bremble is the founder and Chief Executive Officer of Defendant Base Media.

20.     Defendant John Burgee is, and at all relevant times was, a resident of the State of California, County of Los Angeles.  Plaintiff is informed and believes, and based thereon alleges, that Burgee is an attorney licensed to practice in the State of California and a partner in the law firm Burgee and Abramoff.

21.     Defendant Robert Abramoff is, and at all relevant times was, a resident of the State of California, County of Los Angeles.  Plaintiff is informed and believes, and based thereon alleges, that Abramoff is an attorney licensed to practice in the State of California and a partner in the law firm Burgee and Abramoff.

22.     Defendant Burgee & Abramoff is, and at all relevant times was, a California law firm with its principal place of business in the State of California, County of Los Angeles.   Plaintiff is informed and believe and based thereon allege that Burgee & Abramoff  is, and at all times was, employed by and/or were acting as agents for Robl, Chase and the entities they controlled.

23.     Plaintiffs allege that each of the fictitiously named Defendant Does 1-100, is responsible in some manner for some or all of the acts alleged herein. Plaintiffs will seek leave from the Court to amend this Complaint when the true names and capacities of the fictitiously named Defendants have been ascertained. The true and correct names and capacities, whether individual, corporate, associate or otherwise of Defendants, Does 1 through 100, inclusive, are unknown to Plaintiffs, who therefore sue these Defendants by such fictitious names.

COMPLAINT

24.     Plaintiffs are informed and believe and based thereon allege that each of the fictitiously named Defendants is responsible in some manner for the injuries hereinafter alleged.

25.     Plaintiffs are informed and believe and based thereon allege that Defendants, and each of them, at all times herein mentioned, were the principals, agents, employees, servants, co-venturers, partners, co-conspirators and/or legal representatives of each of the other Defendants and that in doing the things herein alleged, Defendants, and each of them, acted within the course and scope of said relationships and with the knowledge, permission, consent, ratification and/or adoption of the other Defendants, and each of them.

## JURISDICTION AND VENUE

26.     This Court has federal question subject matter jurisdiction over Plaintiffs' RICO claims pursuant to 28 U.S.C. §1331.

27.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b) and (c) because Defendants are deemed to reside in any judicial district in which they are subject to personal jurisdiction, and because a substantial part of the events or omissions giving rise to the claims occurred in this District.

## ALLEGATIONS COMMON TO ALL CAUSES OF ACTION

**A.     The Enterprise Defendants Lure Guo into Their Scheme.**

28.     In or about October 2015, Plaintiff Vanessa met Un Lam Choi aka Angel ("Angel") at a social event where Angel told Guo about potential real estate investment opportunities.

29.     Two years later, in or about May 2017, Guo reached out to Angel to inquire about the real estate investment opportunities Angel had discussed at their earlier meeting.  Angel responded that she and her partner, Paul Liang (a Certified Public Accountant from a well-respected Chinese family) had potentially lucrative opportunities not in real estate but related to the financing of film projects.

130325381.1

30.     Angel introduced Guo to Liang who enthusiastically described the opportunities as short term, high interest loans that would provide bridge financing for the production of a slate of film projects being produced by Defendants Kevin Robl and his partner Remington Chase who, according to Liang, had a long and successful track record in the film industry.

31.     Based on the information provided by Liang and Angel, in or about July 2017, Guo made her first $300,000 loan for a film project through KCM Galaxy, an entity owned by Angel.  Guo was advised that the funds would be placed with Knightsbridge Entertainment, Inc. ("Knightsbridge"), a reputable production company.  One month later, Guo loaned an additional $500,000 to KCM Galaxy which Guo understood would be applied to preproduction costs. Guo's KCM loans were timely repaid with a high rate of return.

32.     In or about February 2018, Liang informed Guo that he and Angel were no longer business partners and that the producers would only work through Liang's company, Princeton Projects, Inc. on future loans.  Like the loans placed with KCM Galaxy, the Liang-related loans were timely repaid.

33.     Guo made several loans and investments through Angel and Liang, both short term and long term for a slate of film projects.  The prompt repayment of the loans, and the high interest rate yielded by the loans and promised by the longer term investments, led Guo to believe the short term bridge financing being offered by Liang was a legitimate and sound investment.

34.     As intended by the Enterprise Defendants, the success of her own loans made Guo susceptible to a suggestion from Liang that she present the same film financing opportunities to friends, family and contacts in the Chinese community.  Also at Liang's suggestion, on or about April 24, 2018, Guo and Liang formed Gosdom, Inc. as the vehicle to offer short term bridge financing opportunities to Guo's Chinese contacts who were seeking high rates of return on their money.

COMPLAINT

35.     In or about August 2018, before Guo launched efforts to raise funds from third parties and to encourage Guo to proceed, Liang introduced Guo to Robl and Chase, who Liang described as the principals behind the short financing transactions in which Guo had been participating.  Chase and Robl were fully aware of Guo's extensive ties to the Chinese community both in the United States and China.  Unbeknownst to Guo, Robl and Chase were anxious to exploit these contacts for their ongoing scheme to defraud.

36.     Robl and Chase had carefully set their trap.  Guo was flown in a helicopter purportedly owned by the pair and used in the film "Mission Impossible."  Robl and Chase also claimed to own the majority of private jets and helicopters in a Hawthorne aircraft hangar.  Chase and Robl represented to Guo that they and their fleet of aircraft were responsible for 90% of the air photography for all Hollywood movies.

37.     In or about October 2018, Guo followed Defendants Chase and Robl to Beijing where they arranged a visit their offices and to Base Media.   At the Base Media offices, Guo was introduced to Chis Bremble, Base Media's purported principal who, unknown to Guo, was working hand in glove with Robl and Chase to lure Guo into mining her Chinese contacts for money to fund their Ponzi scheme.

38.     Bremble played cuts from "Wish Dragon" and provided Guo with reviews touting the film and its box office potential.   Bremble told Guo that "Wish Dragon" would be one of Sony's top animation projects and that Sony, Sparke Roll Media ("Sparkle") (a Chines production company) and that Base Media would produce and distributor the film.

39.     After the Beijing trip, Robl and Chase told Guo that Sparkle (a Chinese film company) was experiencing financial problems and was seeking to sell its profit participation in "Wish Dragon" to other investors.

40.     In January 2018, Robl and Chase emailed documents to Guo purportedly from Sony projecting $600 million in worldwide sales for "Wish Dragon," as well as purported agreements with Columbia and Sparkle Roll Media, a Chinese studio.  Guo was told that the funds raised by Guo and Gosdom would be delivered to Base Media and be used for the production of Wish Dragon and other films being produced under the Base Media banner.

41.     Robl and Chase also provided Guo with documentation showing Gosdom as an additional insured on Film Finance, Inc. completion bonds for "Wish Dragon" and other projects.  The pair represented that if the films were not delivered on time or on budget, losses would be covered by the bond company and thus any funds provided by Gosdom or its lenders and investors would be secure.  Of course, neither Robl nor Chase mentioned that no completion bond would insure against losses caused their fraud and theft.

42.     Keeping up the façade, on or about February 21, 2019, Defendants invited Guo to the Base Media facility in Malaysia.  There, Guo was shown Base Media's visual effects for films under production.  Robl and Chase gave Guo a tour of the office and represented to Guo that they owned the company with Bremble.

43.     The following day, Guo was invited to visit Base's studio in Xiamen, China where she viewed the production of "Wish Dragon."  Guo was introduced to the Director, Chris Appelhan, the Head of Production, Michelle Staphylas, and the Head of Studio Animation, Olivier Staphylas.  Based her visit, Guo understood that Base Media had more than 3 offices and approximately 200 employees.

44.     In May 27, 2019, Bremble's assistant in Beijing provided Guo with a business card reflecting that Guo was a Base Media Vice President and a key to Base Media's studio in Beijing.   In a further effort to keep the ruse alive and the money flowing, Chase and Robl promised that in exchange for her loans and efforts to raise capital from Chinese sources, she would receive an equity in interest in Base.

45.     Guo also independently reviewed Base Media's website which showed that Robl was the Executive Vice President of Business Development and that Production Capital, LLC ("Production Capital"), Robl and Chase's company, was a member of the Base Media team.

46.     Bremble was also instrumental in pressuring Guo to obtain Loans from her contacts.  Bremble repeatedly assured Guo that Chase and Robl were trustworthy and his partners.  Chase and Robl similarly confirmed their equity interest in Base Media.  For instance, a July, 2019 email from Chase refers to Bremble as "my partner and friend…"

47.     In fact, Bremble was fully enmeshed in the scheme.  For instance, Bremble signed and stamped a contract for a $3 million loan from Gosdom for the film "Lord of the West".  Bremble also knew that Chase and Robl were using an entity denominated as Base FX USA which was not affiliated with Base Media, as part of their scheme to divest their victims of millions of dollars and, in fact, signed documents on behalf of this fake Base entity.

48.     Guo met with Bremble several times in Base Media's Beijing and Xiamen offices where Bremble provided Guo with information on Wish Dragon, Skyfire, Lord of the West and a yet unnamed "Project X" – the projects for which the loan proceeds would allegedly be used.

49.     Through these artifices and devises, Defendants successfully convinced Guo that they were legitimate movie producers, offering legitimate opportunities for high interest rate loans to be used for short term film financing. Given the success of her own loans, Guo had no reason to suspect that she was being lured into a carefully planned Ponzi scheme to divest Guo and other unsuspecting lenders of millions of dollars ultimately misappropriated by Defendants.

50.     In fact, as a hallmark of any Ponzi scheme, Defendants were merely shuffling proceeds generated by later loans to repay earlier loans, thereby creating

the false impression that the short term loans were safe and yielded extraordinarily high returns.

**B.     The Loan and Investment Agreements.**

51.     Duped into believing that Defendants and their loan and investment opportunities were legitimate, Guo agreed to solicit her network of Chinese investors to supply short term bridge financing, as well as long term equity investments, purportedly needed to produce Wish Dragon, Wally's Wonderland, Lord of the West and other films, purportedly being produced by the Enterprise Defendants.   Defendants promised the equity investors that they were in first position to have their equity and interest be repaid from the waterfall after the films were released.

52.     Robl and Chase directed Guo at every step along the way.

53.     Defendants structured the transactions in a manner intended to insulate themselves from liability.  In the majority of cases, Gosdom would enter into a short term loan and security agreements (the "Loan Documents") with a third party that Guo introduced to the opportunity ("Lender" or collectively, "Lenders").  Chase and Robl provided Gosdom with draft loan documents reflecting the term of the loan (usually four or six months) and the interest rate (as high as 24%).  The Loan Documents also identified the particular film project for which the loan proceeds would be used.   In addition to the promised interest, Lenders were typically promised a small profit participation in the film alleged being financed.

54.     The Loan Documents typically identified Gosdom as the "Borrower" or "Maker," with the obligation to repay the loans.  Plaintiffs are informed and believes, and based thereon alleges, that the Loan Documents were prepared by Chase and Robl's lawyers at the law firm of Burgee & Abramoff.

55.     Once the Lenders executed the Loan Documents, Defendants would provide Guo with a parallel loan agreement between Gosdom and an entity owned

or controlled by Defendants, usually Base Media, the purported producer of the films, was the borrower on the vast majority of these contracts, but also the fictional Base FX or other entity controlled by Defendants including Production Capital.

56.     After underlying contracts were signed, Robl or Chase would instruct Guo on the disposition of the loan proceeds.  On some occasions, Guo was directed to have Lenders deposit the loan amounts with Gosdom.  Gosdom would then transfer the funds as directed by Robl and Chase.  Typically, Gosdom would bundle funds received from Lenders into larger loans to Base Media to purported minimum loan and investment guidelines.  Between 2018 and 2019, Plaintiffs transferred, or caused the transfer of, approximately $3.8 million from Gosdom to Base Media's HSBC account.  For instance,

(a)     On or about March 1, 2019, Gosdom executed a loan agreement with Base Media for $1420000.

(b)     On or about May 1, 2019, Gosdom entered into a Loan & Security Agreement with Base Media for $2.4 million.

(c)     On or about May 8, 2019, Gosdom entered into a Loan & Security Agreement with Base Media for $1 million.

57.     As noted, some lenders and investors introduced by Guo signed contracts and wired their funds directly into Base Media accounts on the belief that the investments would be safer if the contracts were directly with the alleged producers.  In 2018 and 2019, lenders introduced by Gosdom wired a total of $4.32 million directly to Base Media's HSBC account (only $1.27 million has been returned).

58.     As also noted, a small number of loan agreements identified Production Capital as the borrower.  For instance, an August 1, 2019 Loan Agreement between Gosdom and Production Capital for $640,000.  Robl represented that this company was a financing arm of Base Media.  In fact,

130325381.1

Production Capital was an entity controlled by Robl and used by Robl as part of Defendants' scheme to divest investors of their funds.  At the Enterprise Defendants direction, these funds were wired to a client trust account at Burgee & Abramoff.

59.    In fact, between 2018 and 2019, at Defendants' instruction, no less than $3.125 million in total loan proceeds were wired to the Burgee & Abramoff client trust account.  Chase told Guo that the law firm was collecting funds for Base because the firm represented Base Media and was drafting the relevant agreements.  In one instance, Chase texted Guo that "the law firm that will be collecting all of the funds for the production of Wally's Wonderland. This law firm will be receiving and dispersing the funds to the production companies to secure the rebates and tax credits that we've discussed."  Plaintiffs are informed and believe, and based thereon allege, that the funds were immediately whisked away by Defendants for uses other than Wally's Wonderland or other film productions.

60.    As further noted, several of the Gosdom loan agreements were with the fictional Base FX.  For instance,

(a)    On or about June 26, 2019, Defendants provided Gosdom with a Loan & Security Agreement with Base FX for $1,530,000 purportedly to fund Lord of the West.

(b)    On or about July 7, 2019, Defendants provided Gosdom with a Loan & Security Agreement Base FX for $500,000.

61.    At one point, Defendants provided Guo with a contract for a $3 million loan to Base FX International Hong Kong.  Plaintiffs subsequently learned that this entity is not affiliated with Base Media and appears to be a fictitious company.  Nevertheless, the documents are signed by Bremble and bear Base Media's stamp (typically used on Asian documents).  These funds were never sent but this contract confirms Bremble's knowledge and participation in Robl and Chase's scheme.

62.     In other instances, and always at the direction of the Enterprise Defendants, Guo would be instructed to have Gosdom or parties she introduced enter into "Investment Agreements" with an entity designated by the Enterprise Defendants.  Others introduced by Gosdom asked to enter into agreements with, and directly wire their funds to, Base Media.  In each instance, the Enterprise Defendants would identify the account to which the funds would be wired.  For instance,

(a)     On January 28, 2019, the Burgee firm sent an "Investment Agreement" between Base Media and Jonathan Chu, an investor introduced by Gosdom.  On January 30, 2019, Chu wired $800,000 to Base Media purportedly to fund Wish Dragon.

(b)     On January 28, 2019, the Burgee firm sent "Investment Agreements" between Base Media and Zhihui Weng, an investor introduced by Gosdom, and her son, Yao Chang Chen.  On January 30, 2019, Weng wired $2 million to Base Media's HSBC account in Hong Kong for his investment and Chang's purportedly to finance Wish Dragon.

(c)     On January 28, 2019, Gosdom entered into an Investment Agreement with Base Media for Wish Dragon. Pursuant to the agreement, Gosdom wired $600,000 to Base Media's HSBC account in Hong Kong; and

(d)     On March 15, 2019, Lyn Auto, introduced by Gosdom, entered into a Loan & Security Agreement with Base Media for Skyfire.  On March 18, 2019, Lyn Auto wired $250,000 to Base Media.

63.     On several occasions, Chase instructed Guo to transfer funds to Production House International, which Chase represented as a financial arm of Base Media.  Plaintiffs are informed and believe, and based thereon alleged, that Production House International was merely a cipher for Chase.

130325381.1

64.     In short, Defendants were engaged in a shell game with monies being shuffled to and from a laundry list of entities including Base Media, Production Capital, Production House International and the Burgee & Abramoff trust account.

65.     Payments on the loan payments would frequently come from entities that were neither party to a loan agreement with the Lenders or Gosdom nor a production company that was an intended recipient of the loan.

66.     In some instances, Lenders introduced by Guo would enter into contracts directly with Base Media, but this was exception, rather than the rule.

67.     Plaintiff is informed and believes, and based thereon alleges, that Burgee & Abramoff made no effort to stop Defendants from siphoning off these funds or to confirm that the funds were being applied as represented in the underlying loan agreements which were drafted by Burgee and Abramoff.

68.     As part of the ruse to keep the spigots open, and an earmark of Ponzi schemes, early loans paid off handsomely.  Encouraged by the returns, Guo continued to tout the loans as lucrative business opportunities.   In fact, as a hallmark of any Ponzi scheme, Defendants were merely shuffling proceeds generated by later loans to repay earlier loans, thereby creating the false impression that the short term loans were safe and yielded extraordinarily high returns.   Thus, as planned by the Enterprise Defendants, many Lenders encouraged by early results rolled their principal and early paper gains into loans for other film projects promoted by the Enterprise Defendants.

69.     The structure dictated by Defendants made Gosdom directly liable to Lenders for repayments of the Loans.   Gosdom, in turn, was dependent on Base Media, Production Capital, and the like to repay their loans in order for Gosdom to meet its contractual obligations.  By this artifice, Defendants shifted all repayment obligations to Gosdom, thereby (at least on paper) insulating themselves from direct liability to the Lenders who were the intended victims of their scheme.

130325381.1

70.     When Guo questioned Robl and Chase about slow repayments on some loans, they provided multiple excuses for missing payment deadlines and their escalating need for outside capital despite the alleged involvement of major studios in the productions.

71.     For instance, Guo was told that HSBC Bank in Hong Kong had not finalized approval of a financing package and therefore short term loans were necessary to float production until the financing was completed.  In or about August, 2019, Robl and Chase represented that their HSBC account in Hong Kong was frozen and they needed short term cash for productions.  Defendants explained that such freezes were common and only lasted a short period of time.  Other explanations involved issues with the Chinese government and currency exchanges.  Guo had no reason to question the veracity of these representations and, in fact, Defendants continued to make some payments.

72.     On or about November 10, 2019, Gosdom entered into a "Cooperation Agreement" with Bremble and Base Media which Bremble purportedly signed as "CEO:  Christopher Bremble" of Base FX, which was a fictional entity employed by Defendants as part of their scheme.  Plaintiffs are informed and believe, and based thereon alleged, that Bremble's signature may have been forged by Chase and Robl.   Two weeks later, on November 24, 2019, Chase presented Guo with opportunities for the films "Wally's Wonderland," "Top Gun: Maverick" and "Fast and Furious 7."

73.     On or about December 16, 2019, Chase represented that a Chinese company, "Sunac," (Sunac China Holdings Limited, a major property developer headquartered in Tianjin) was providing a significant deposit for the Chinese distribution rights for "Top Gun: Maverick" which would furnish the funds necessary for Base Media to satisfy its short terms financing obligations and would somehow "bump up" to Guo's fictional percentage in Base Media:

17

COMPLAINT

130325381.1

"I'll have a better idea of exactly what I've got and can bring to the table regarding Top Gun Chinese right by the end of tomorrow.  The sunac deal will close here in Xiamen, We're simply going over all of the details.  Please understand that's the signing of all the documents.  Regarding Receiving payment from Sunac, and taking over all liabilities of base, that is scheduled for January 5  With myself agreeing not to demand return of my investment in KL (Kuala Lumpur) immediately, it looks like I will be receiving 27 ½% of the new company.  With that said it looks like I need to bump up your percentage of ownership….."

74.     This too was a hollow promise.  Guo never received an equity in interest in Base Media or any of films allegedly being produced by Base Media and was never compensated as a Base Media officer.

75.     Continuing the charade, on or about February 2, 2020, Robl and Chase flew Guo and Liang by private jet, along with Gosdom lenders and potential lenders, to Atlanta, Georgia where "Wally's Wonderland" was being filmed.  Chase was waiting when they arrived and escorted the group to the set where they took photos with Nicholas Cage, who was featured in the film.  Guo was also introduced the producer Grant Cramer.

76.     Defendants' representations and the orchestrated visits to Base Media arranged by Defendants, were designed to convince, and did convince, Guo that Defendants were legitimate and movie producers, who were properly using the Gosdom loan to finance their productions.  Having been successfully duped by Defendants, Gosdom continued to solicit short terms loans from her contacts in the Chinese community.

**C.     The Culmination of the Scheme.**

77.     By October 2021, the façade was cracking.  At this point, a number of Gosdom loans were overdue and Gosdom was using its own funds to repay Lenders.  When Guo reached out to Bremble, he explained that Sony was paying production costs but the payments were slow to arrive.  Ultimately, however, Bremble admitted that Base Media was over leveraged and that the short terms

loans facilitated by Gosdom were not being used for production costs on "Wish Dragon" or other designated films, but that a substantial portion of the loan proceeds had been diverted to Robl and Chase for their own purposes, including their acquisition of a substantial equity stake in Base Media.

78.     The misrepresentations and excuses from Defendants continued. Shamelessly, in 2021, Robl informed Plaintiff that he was approved for a $100 million line of credit from which he would repay Gosdom and the Gosdom Lenders.

79.     In reliance on these representation, Gosdom – with Robl's knowledge and participation – attempted to reach settlements with certain Lenders.  Consistent with his pattern of fraud, Robl's representation repeated as recently as January 2022, proved false.

80.     The full scope of the fraud is still unknown to Plaintiffs.  However, Defendants scheme has generated over $18 million in losses to Guo and Gosdom and, ultimately, to Gosdom's lenders who funds were diverted by Defendants.

## FIRST CLAIM FOR RELIEF

### (Fraudulent Inducement against Robl, Chase and Bremble)

81.     Plaintiffs incorporate Paragraphs 1 through 80 above as though fully set forth herein.

82.     Between 2018 and early 2020, Plaintiffs entered into multiple loan and investment agreements with Base Media and other entities controlled by Chase and Robl (collectively, the "Gosdom Loan Agreements").

83.     To induce Plaintiffs into entering into the loan and investment agreements, Defendants Chase, Robl and Bremble made the following material misrepresentations, among others, to Plaintiffs which were repeated numerous times between 2018 and 2021:

(a)     Debt and equity raised by Plaintiffs would be delivered to Base Media for use as short term bridge financing for production costs on designated films including, without limitation, Wish Dragon, Skyfire and Lord of the West, as well as long term equity financing.

(b)     Equity investors were in first position for repayment from the waterfall, after the film's release.

(c)     Base Media would timely repay the loans at high interest rates.

(d)     Lenders, including Plaintiffs, would be given an equity interest or profit participation in films being produced by Base Media which were the intended beneficiaries of the Loans;

(e)     Chase and Robl were principals in Base Media;

(f)     Chase and Robl were producers of the films allegedly being produced by Base Media;

(g)     Gosdom was an additional insured on Film Finance, Inc. completion bonds which protected Gosdom, its Lenders and its investors from losses stemming from the films being financed by Gosdom;

(h)     Sony was late in paying production costs, necessitating short term financing arrangements;

(i)     Short term financing was required because HSBC temporarily froze Base Media's funds; and

(j)     Sparkle was selling its interest in Wish Dragon, which would be available to Plaintiffs and their lenders and investors.

84.     Between 2018 and early 2020 omitted the following material facts to induce Plaintiffs into entering short term financing agreements:

(a)     Loan proceeds would not be delivered to Base Media to cover production costs;

(b)     Funds would be diverted by Chase and Robl for purposes other than film financing;

(c)    Defendants would use, and were using, later loans to repay earlier loans; and

(d)    Base Media was overleveraged and did not have the capacity to repay the Loans.

85.    The aforementioned representations were knowingly false at the time they were made.

86.    The aforementioned material misrepresentations and omissions were made with the intent to induce Plaintiffs into entering into the Gosdom Loan Agreements;

87.    At the time the aforementioned promises were made, Defendants did not intend to perform their obligations under the loan and investment agreements.

88.    Plaintiff justifiably relied on Defendants' material misrepresentations and omissions in entering into the loan and investment agreements.  Plaintiff would not have entered into the agreements had they known the true facts.

89.    As a direct and proximate result of Defendants' conduct, Plaintiffs have been damaged in an amount to be proven at trial, but not less than $18 million.

90.    In doing the acts described above, Defendants acted with malice, fraud and oppression, entitling Plaintiffs to exemplary and punitive damages in an amount to be proven at trial.

## SECOND CLAIM FOR RELIEF

### (Common Law Fraud against Robl, Chase and Bremble)

91.    Plaintiffs incorporate Paragraphs 1 through 90 above as though fully set forth herein.

92.    Between 2018 and early 2020, Defendants Chase, Robl and Bremble made the following misrepresentations to Plaintiffs:

130325381.1

93.    On multiple occasions between 2018 and early 2020, Chase, Robl and Bremble made the following material misrepresentations to Plaintiffs, among others:

(a)    Debt and equity raised by Plaintiffs would be delivered to Base Media for use as short term bridge financing for production costs on designated films including, without limitation, Wish Dragon, Skyfire and Lord of the West, as well as long term equity financing.

(b)    Equity investors were in first position for repayment from the waterfall, after the film's release.

(c)    Base Media would timely repay the loans and investments with high returns.

(d)    Lenders, including Plaintiffs, would be given an equity interest or profit participation in films being produced by Base Media which were the intended beneficiaries of the Loans;

(e)    Chase and Robl were principals in Base Media;

(f)    Chase and Robl were producers of the films allegedly being produced by Base Media;

(g)    Gosdom was an additional insured on Film Finance, Inc. completion bonds which protected Gosdom and its Lenders from losses stemming from the films being financed by Gosdom;

(h)    Sony was late in paying production costs, necessitating short term financing arrangements;

(i)    Short term financing was required because HSBC temporarily froze Base Media's funds; and

(j)    Sparkle was selling its interest in Wish Dragon, which would be available to Plaintiffs and their lenders and investors.

130325381.1

(k)     Reinvested loan proceeds would be used for short terms financing of film projects such as, without limitation, Lord of the West, Fast & Furious 9, Wally's Wonderland, Matrix 4 and The Mandalorian.

(l)      Funds deposited in the Burgee & Abramoff client trust account were safe, and would be used for the stated purpose of short term film financing and to secure rebates and tax credits; and

(m)    Production Capital and Production House International were financing arms of Base Media.

94.    Between 2018 and early 2020 omitted the following material facts to induce Plaintiffs into entering short term financing agreements:

(a)     Loan and investment proceeds would not be delivered to Base Media to cover production costs;

(b)     Funds would be diverted by Chase and Robl for purposes other than film financing;

(c)     Defendants would use, and were using, later loans and investments to repay earlier loans and investments; and

(d)     Base Media was overleveraged and did not have the capacity to repay the loans or investments.

95.    The aforementioned representations and material omission were knowingly false at the time they were made.

96.    The aforementioned material misrepresentations and omissions were made to induce Plaintiffs into entering into the loan and investment agreements, soliciting funds from third parties introduced by Plaintiffs, encouraging lenders and investors to reinvest the proceeds from their earlier transactions and induce Plaintiffs into refraining from any action to recover on their loans or investments.

97.    In reliance on Defendants material misrepresentations and omissions, Plaintiffs were induced into entering into the loan and investment agreements, soliciting funds from third party lenders and investors, encouraging lenders and

COMPLAINT

130325381.1

investors to reinvest the proceeds from their earlier loans and to induce Plaintiffs into refraining from any action to recover on the their loans and investments.

98.    Plaintiffs' reliance on Defendants' material misrepresentations and omissions was justified.

99.    Plaintiffs would not have entered into the agreements, solicited funds from third parties or encouraged lenders or investors to reinvest the proceeds from their earlier loans but for Defendants' misrepresentations and material omissions.

100.    As a direct and proximate result of Defendants' conduct, Plaintiffs have been damaged in an amount to be proven at trial, but not less than $18 million.

101.    In doing the acts described above, Defendants acted with malice, fraud and oppression, entitling Plaintiffs to exemplary and punitive damages in an amount to be proven at trial.

### THIRD CLAIM FO RELEASE

**(Violation of California Penal Code § 496c against All Defendants)**

102.    Plaintiffs incorporate Paragraphs 1 through 101 above as though fully set forth herein.

103.    Between 2018 and early 2020, Defendants and each of them defrauded Plaintiffs into providing in excess of $18 million in funds as short term bridge financing for film projects.

104.    Defendants did not use the funds entrusted to them for the stated purpose of financing film projects allegedly being produced by Plaintiffs.  Instead, Defendants and each of them diverted, siphoned off and stole the loans proceeds for their own nefarious purposes.

105.    Defendants Chase, Robl and Bremble used a web of entities and individuals to transfer, conceal and funnel the Stolen Funds into their pockets, including the law firm of Burgee & Abramoff which was used as a conduit for the stolen funds.

130325381.1

106.   At all relevant times, Burgee and Abramoff, individually, knew their client trust account was being used to divert, misappropriate and steal funds from Plaintiffs and facilitated the transfers and theft of Plaintiffs' funds.

107.   As a direct and proximate result of Defendants' conduct, Plaintiffs have been damaged in an amount to be proven at trial but not less than $18 million.

108.   As a result of the acts described above, Plaintiffs are entitled to recover treble damages pursuant to Penal Code § 496c.

<u>**FOURTH CLAIM FOR RELIEF**</u>

**(Breach of Fiduciary Duty against Burgee, Abramoff and Burgee & Abramoff)**

109.   Plaintiffs incorporate Paragraphs 1 through 108 above as though fully set forth herein.

110.   As directed by Defendants, Plaintiffs deposited loans into the trust account of the law firm of Abramoff & Burgee where the funds were to be held in trust for the benefit of Plaintiffs.

111.   As constructive trustee for Plaintiffs' funds, Burgee & Abramoff and its principals, John Burgee and Robert Abramoff (collectively, the "Burgee Defendants"), owed a fiduciary obligation of the highest trust and loyalty to Plaintiffs.

112.   The Burgee Defendants breached their fiduciary obligations by transferring Plaintiffs funds as directed by Defendants to accounts controlled by Defendants, for uses other than those stated in the Loan Documents.  Plaintiffs are informed and believe, and based thereon allege, that in releasing Plaintiffs' funds to Defendants, the Burgee Defendants facilitated Defendants' fraud and the theft of Plaintiffs funds by the Enterprise Defendants in breach of the Burgee Defendants fiduciary obligations to Plaintiffs.

130325381.1

113.   As a direct and proximate result of Defendants' conduct, Plaintiffs have been damaged in an amount to be proven at trial, but not less than $18 million.

114.   In doing the acts described above, Defendants acted with malice, fraud and oppression, entitling Plaintiffs to exemplary and punitive damages in an amount to be proven at trial.

## FIFTH CLAIM FOR RELIEF

### (Civil RICO against the Enterprise Defendants)

115.   Plaintiffs incorporate Paragraphs 1 through 114 above as though fully set forth herein.

116.   Plaintiffs and the Enterprise Defendants are "persons" as defined in 18 U.S.C. § 1961(3).

117.   At a time unknown to Plaintiffs, but no later than October 2018, Defendants Base Media, Production Capital and individual Defendants Robl, Chase and Bremble, joined together and agreed to form an association-in-fact enterprise within the meaning of 18 U.S.C. § 1961(4) (the "Scheme").

118.   The object of the Scheme was to defraud Plaintiffs and others into lending millions of dollars to the Enterprise on the ruse that the funds would be used for short term bridge financing for films allegedly being produced by the Enterprise Defendants.  In fact, the Enterprise Defendants did not intend to use the funds for the stated purpose, or to repay the loans, but to divert the loan proceeds their own use and benefit.

119.   Each Enterprise Defendant operated, managed and/or participated in the Investment Scheme, and the Enterprise Defendants worked together to execute the fraud.

120.   The Scheme has functioned as a continuing enterprise since at least October 2018, when the Enterprise Defendants first solicited loans from Guo and Gosdom.

COMPLAINT

130325381.1

121.   The Scheme is an ongoing organization consisting of multiple legal "persons" associated for common and shared purposes, including: (a) to defraud lenders money by misrepresenting material facts about loans allegedly destined to provide Base Media with short term bridge financing for the production of films including, without limitation, Wish Dragon, Skyfire, Wally's Wonderland, Lord of the West and other films; (b) using the proceeds from new loans and investments to repay existing lenders and investors and/or to pay unrelated personal and business expenses; (c)  falsifying business records and transactional documents to artificially inflate the value of Base Media and its assets and provide assurances about safety of the loans and investments; (d) allaying investor concerns by representing that funds deposited in the Burgee & Abramoff client trust would remain in trust when, in fact, the funds were appropriated by the Enterprise Defendants for their own purposes; and (g) creating shell entities to conceal the risk to investors and the fraudulent use of investors' funds.

122.   In furtherance of the Scheme, Defendants engaged in a pattern of racketeering activity affecting interstate commerce.

123.   Also in furtherance of the Scheme, the Enterprise Defendants engaged in two or more predicate acts including, among others:

(a)   Meeting with Plaintiffs at Base Media in Beijing in October 2018 and on March 6, April 12, April 18, May 26 and September 12, 2019;

(b)   Meeting with Plaintiffs at Base Media in Malaysia on February 21, 2019;

(c)    Meeting with Plaintiffs at Base Media in Xiamen on February 25 and May 28, 2019; and

(d)   Wiring and receiving funds from Gosdom and Gosdom Lenders between 2018 and 2021.

124.   Through their enterprise, Plaintiffs engaged in a pattern of unlawful activity and specified unlawful acts in violation of 18 U.S.C. §§ 1341 and 1343 including, without limitation:

    (a)    The use of wires or mail to deliver a January 28, 2019 Investment Agreement for Wish Dragon;

    (b)    The use of wires or mail to deliver a Security & Investment Agreement between Base Media and Gosdom on January 28, 2019;

    (c)    The use of wires or mail to deliver correspondence from Burgee & Abramoff to Yao Chang Chen and Zhuhui on January 28, 2019 confirming a $2 million investment with Base Media for Wish Dragon;

    (d)    The use of wires or mail to deliver correspondence from Burgee & Abramoff to Jonathan Chu confirming an $800,000 investment on January 28, 2019; and

    (e)    The use of wires or mail to deliver an August 1, 2019 Loan Agreement between Production Capital and Gosdom by wire or mail to Plaintiffs, with instructions to wire funds to a Production Capital account.

125.   The Enterprise Defendants also used the mail and wires to communicate with each other and Plaintiffs using the mail, email, and telephone to achieve the objects of the Scheme, including the sharing of Loan Agreement and falsified documentation, directing the disposition of loan proceeds, soliciting Loans and providing reasons why short term financing was necessary for the films.

126.   The conduct of the Enterprise Defendants constitutes a pattern of racketeering activity by mail fraud, in violation of 18 U.S.C. § 1341, and wire fraud, in violation of 18 U.S.C. § 1343.

127.   The Scheme involved interstate and foreign commerce in that, among other things, Loans were solicited from U.S. citizens in multiple states, as well as

citizens and residents of Hong Kong, the films that were allegedly being financed were produced in China and Malaysia and funds generated from the Loans were wired to and from interstate and international accounts controlled by the Enterprise Defendants.

128.   The activities described in paragraphs 28 through 80, above, constitute a pattern of unlawful racketeering activity.

129.   As a direct and proximate result of the Enterprise Defendants' wrongful conduct and pattern of racketeering activity in violation of 18 U.S.C. § 1962(c), Plaintiffs have suffered damages in an amount to be proven at trial but not less than $18 million.

130.   As a direct and proximate result of the Enterprise Defendants' wrongful conduct and pattern of racketeering activity in violation of 18 U.S.C. § 1962(c), Plaintiffs are entitled to recover treble damages.

## SIXTH CLAIM FOR RELIEF

### (Civil RICO Conspiracy against the Enterprise Defendants)

131.   Plaintiffs incorporate Paragraphs 1 through 130 above as though fully set forth herein.

132.   The Enterprise Defendants conspired and agreed to violate 18 U.S.C. § 1961(c) by engaging in the Scheme to defraud Plaintiffs as set forth above.

133.   Each Enterprise Defendant agreed to join and acted in furtherance of the object of the conspiracy to defraud Plaintiffs and others into lending millions of dollars to the Enterprise on the ruse that the funds would be used for short term bridge financing for films allegedly being produced by the Enterprise Defendants. In fact, the Enterprise Defendants did not intend to use the funds for the stated purpose, or to repay the loans, but to divert the loan proceeds their own use and benefit.

130325381.1

134.    In furtherance of the object of the conspiracy, the Enterprise Defendants, and each of them, engaged in one or more the following predicate acts:

(a)    Meeting with Plaintiffs at Base Media in Beijing in October 2018 and March 6, April 12, April 18, May 26 and September 12, 2019;

(b)    Meeting with Plaintiffs at Base Media in Malaysia on February 21, 2019;

(c)    Meeting with Plaintiffs at Base Media in Xiamen on February 25 and May 28, 2019; and

(d)    Wiring and receiving funds from Gosdom and Gosdom Lenders between 2018 and 2021.

(e)    Providing Plaintiffs with Loan and Investment Agreements for the fraudulent loans and investments on the following dates, among others:  January 28, 2019, January 30, 2019 and March 15, 2019; and

(f)    Instructing Plaintiffs on the deposit of loan proceeds into accounts designated by the Enterprise Defendants, including the Abramoff & Burgee trust account.

135.    As a direct and proximate result of the Enterprise Defendants' wrongful conduct and pattern of racketeering activity in violation of 18 U.S.C. § 1962(c), Plaintiffs have suffered damages in an amount to be proven at trial but not less than $18 million.

136.    As a direct and proximate result of the Enterprise Defendants' wrongful conduct and pattern of racketeering activity in violation of 18 U.S.C. § 1962(c), Plaintiffs are entitled to recover treble damages.

130325381.1

**SEVENTH CLAIM FOR RELIEF**

**(Securities Fraud in Violation of California Corporations Code §§ 25401 and 25501 against the All Defendants)**

137.   Plaintiffs incorporate Paragraphs 1 through 136 above as though fully set forth herein.

138.   The loan and equity opportunities offered by the Enterprise Defendants to Gosdom were securities as that terms is defined by California Corporations Code § 25008(a).

139.   Between late 2018 and 2021, the Enterprise Defendants, and each of them, made knowingly false statements and material omissions in connection with the offer or sale of securities including, among other things,

(a)   Debt and equity raised by Plaintiffs would be delivered to Base Media for use as short term bridge financing for production costs on designated films including, without limitation, Wish Dragon, Skyfire and Lord of the West, as well as long term equity financing, while failing to disclose that loan proceeds and equity investments would be used for purposes other short term bridge financing for designated films;

(b)   Equity investors were in first position for repayment from the waterfall, after the film's release.

(c)   Base Media would timely repay the loans at high interest rates.

(d)   Lenders and investors, including Plaintiffs, would be given an equity interest or profit participation in films being produced by Base Media which were the intended beneficiaries of the invested funds;

(e)   Chase and Robl were principals in Base Media;

(f)   Chase and Robl were producers of the films allegedly being produced by Base Media;

130325381.1

(g)     Gosdom was an additional insured on Film Finance, Inc. completion bonds which protected Gosdom and its Lenders from losses stemming from the films being financed by Gosdom;

(h)     Sony was late in paying production costs, necessitating short term financing arrangements;

(i)     Short term financing was required because HSBC temporarily froze Base Media's funds; and

(j)     Sparkle was selling its interest in Wish Dragon, which would be available to Plaintiffs and their lenders and investors.

(k)     Reinvested loan proceeds would be used for short terms financing of film projects such as, without limitation, Lord of the West, Fast & Furious 9, Wally's Wonderland, Matrix 4 and The Mandalorian.

(l)     Funds deposited in the Burgee & Abramoff client trust account were safe, and would be used for the stated purpose of short term film financing and to secure rebates and tax credits; and

(m)     Production Capital Media and Production House International were financing arms for Base Media.

140.   Between 2018 and early 2020 omitted the following material facts to induce Plaintiffs into entering short term financing agreements:

(a)     Loan and investment proceeds would not be delivered to Base Media to cover production costs;

(b)     Funds would be diverted by Chase and Robl for purposes other than film financing;

(c)     Defendants would use, and were using, later loans to repay earlier loans; and

(d)     Base Media was overleveraged and did not have the capacity to repay the loans or investments.

130325381.1

141.   The aforementioned representations and material omission were knowingly false at the time they were made.

142.   The aforementioned material misrepresentations and omissions were made to induce Plaintiffs into entering into the loan and investment agreements, soliciting funds from third parties introduced by Plaintiffs, encouraging lenders and investors to reinvest the proceeds from their earlier transactions and induce Plaintiffs into refraining from any action to recover on their loans or investments.

143.   In reliance on Defendants material misrepresentations and omissions, Plaintiffs were induced into entering into the loan and investment agreements, soliciting funds from third party lenders and investors, encouraging lenders and investors to reinvest the proceeds from their earlier loans and to induce Plaintiffs into refraining from any action to recover on the their loans and investments.

144.   Plaintiffs' reliance on Defendants' material misrepresentations and omissions was justified.

145.   Plaintiffs would not have entered into the agreements, solicited funds from third parties or encouraged lenders or investors to reinvest the proceeds from their earlier loans but for Defendants' misrepresentations and material omissions.

146.   As a direct and proximate result of Defendants' fraud, Plaintiffs have suffered damages in an amount to be proven at trial but not less than $18 million.

147.   The Defendants, and each of them, are jointly and severally liable pursuant to Corporations Code §25504.1.

148.   As a direct and proximate result of Defendants' fraud, Plaintiffs are entitled to rescission of the loan and investments agreements between Gosdom and the Defendants, or each of them.

130325381.1

## EIGHTH CLAIM FOR RELIEF

**(Sale of Unregistered Securities Fraud in Violation of California Corporations Code § 25110 against the Enterprise Defendants)**

149.   Plaintiffs incorporate Paragraphs 1 through 148 above as though fully set forth herein.

150.    The loan and equity opportunities offered by the Enterprise Defendants to Gosdom were securities as that terms is defined by California Corporations Code § 25008(a).

151.   The loan and equity opportunities offered for sale to Gosdom by the Enterprise Defendants to Gosdom were not exempt from the qualification requirements imposed by California Corporations Code §25110.

## NINTH CLAIM FOR RELIEF

**(Breach of Contract against Base Media aka Base FX)**

152.   Plaintiffs incorporate Paragraphs 1 through 151 above as though fully set forth herein.

153.   Between October 2018 and December 2021, Gosdom entered into a series of loan and investment agreements with Base Media including, without limitation:

(a)   A $1 million Security & Loan agreement for Wish Dragon, on May 8, 2019.

(b)   A $1.42 million Loan Agreement for Skyfire, on March 1, 2019.

(c)   A $500,000 Investment Agreement for Skyfire, on July 7, 2019.

(d)   A $2.4 million Loan & Security Agreement for Lord of the West, on May 1, 2019.

(e)   A $1.53 million Loan & Security Agreement for Lord of the West, on June 26, 2019.

154.   The agreements, and each of them, provided for Gosdom to provide short term financing and long term equity financing for film productions including

130325381.1

Wish Dragon, Wally's Wonderland and Lord of the West.  In exchange, Base Media promised to repay the loans and investments with interest on a date certain and convey an equity interest in Base Media and/or the revenues of the films being financed.

155.   Gosdom fully performed its obligations under the agreements, and each of them, by delivering the required funds to Base Media.

156.   Base Media breached the agreements, and each of them, by failing to repay principal and interest to Gosdom and failing to convey an equity interest in Base Media or particular films being produced by Base Media which were allegedly financed with Gosdom's loans.

157.   As a direct and proximate result of Defendant's breaches, Plaintiffs' have been damaged in an amount to be proven at trial but not less than $6.5 million.

## TENTH CLAIM FOR RELIEF

### (Breach of Contract against Production Capital)

158.   Plaintiffs incorporate Paragraphs 1 through 157 above as though fully set forth herein.

159.   Between October 2018 and December 2021, Gosdom entered into a series of loan agreements with Production Capital including, without limitation, a $640,000 Loan Agreement, dated August 1, 2019.  The agreements provided for the funds to be used for short terms financing for the production of for The Mandalorian.

160.   The loan agreements provided for Gosdom to provide short term financing for film productions including Wish Dragon, Wally's Wonderland and Lord of the West.  In exchange, Production Capital promised to repay the loans with interest on a date certain and convey an equity interest in Base Media and/or the revenues of the films being financed.

COMPLAINT

130325381.1

161.   Gosdom fully performed its obligations under the agreements, and each of them, by delivering the required funds to Production Capital.

162.   Production Capital breached the agreements and each of them by failing to repay principal and interest to Gosdom and failing to convey an equity interest in Base Media or particular films being produced by Base Media which were allegedly financed with Gosdom's loans.

163.   As a direct and proximate result of Defendant's breaches, Plaintiffs' have been damaged in an amount to be proven at trial but not less than $3 million.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for judgment as follows:

1.     For actual and compensatory damages according to proof but not less than $18 million;

2.     For exemplary and punitive damages;

3.     For treble damages;'

4.     For rescission of Gosdom's loan and investment agreements;

5.     For costs of suit including reasonable attorney's fees; and

6.     For such other and further relief as the court may deem proper.

Dated: August 8, 2022              CARLTON FIELDS, LLP
                                   By:__/s/ Ellyn S. Garofalo_____
                                        Ellyn S. Garofalo
                                        Amir Kaltgrad
                                   Attorneys for Plaintiffs Yao Guo aka
                                   Vanessa Guo and Gosdom, Inc.

36

COMPLAINT

130325381.1